### UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

WENDY MARIE ROSENBERG,

                                    Plaintiff,

vs.

EQUIFAX INFORMATION SERVICES
LLC, EXPERIAN INFORMATION
SOLUTIONS, INC., TRANS UNION, LLC,
and AMERICREDIT FINANCIAL
SERVICES, INC., d/b/a GM FINANCIAL,

                                    Defendants.

CASE NO.:   0:21-cv-00085

**JURY TRIAL DEMANDED**

## COMPLAINT

Wendy Marie Rosenberg ("Plaintiff" or "Ms. Rosenberg") brings this Complaint against Equifax Information Services LLC ("Equifax"), Experian Information Solutions, Inc. ("Experian"), Trans Union, LLC ("Trans Union"), and AmeriCredit Financial Services, Inc., d/b/a GM Financial ("GM Financial") (collectively the "Defendants") for actual, statutory, and punitive damages, costs, and attorney's fees, for violations of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681, *et seq.*

### PRELIMINARY STATEMENT

1.      This is an action for statutory, actual, and punitive damages; costs; and attorney's fees brought pursuant to the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681-1681x.

2.      The purpose of the FCRA is to require consumer reporting agencies to "adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with

1

regard to the confidentiality, ***accuracy***, relevancy, and proper utilization of such information." 15 U.S.C. § 1681 (emphasis added). In furtherance of its underlying purposes, the FCRA sets out requirements and obligations that consumer reporting agencies, § 1681i, and their furnishers of information, § 1681s-2(b), must follow when consumers dispute the accuracy of the information reported in their credit reports.

3.      This case concerns Defendants' reporting of a delinquent auto loan tradeline on Plaintiff's credit reports despite the fact that Plaintiff never once made a late payment on the account at issue and it had been paid in full.

4.      Accordingly, Plaintiff brings claims against Experian, Equifax, and Trans Union for failing to reasonably ensure the maximum possible accuracy of Plaintiff's credit reports in violation of the FCRA, 15 U.S.C. § 1681e(b), and for their failure to fulfill their reinvestigation duties in violation of the FCRA, 15 U.S.C. § 1681i.

5.      Plaintiff also brings claims against GM Financial for failing to fully and properly investigate Plaintiff's disputes and to review all relevant information provided by the consumer reporting agencies in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

## THE PARTIES

6.      Plaintiff Wendy Marie Rosenberg is a natural person who resides in the City of Hopkins, County of Hennepin, State of Minnesota, and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

7.      Defendant Equifax Information Services, LLC ("Equifax") is a foreign limited liability company authorized to do business in the State of Minnesota.

8.      Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information

concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

9.     Defendant Experian Information Solutions, Inc. ("Experian") is a foreign limited liability company authorized to do business in the State of Minnesota.

10.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

11.    Defendant Trans Union, LLC ("Trans Union") is a foreign limited liability company authorized to do business in the State of Minnesota.

12.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

13.    Defendant GM Financial is a foreign corporation authorized to do business in the State of Minnesota. GM Financial is a credit grantor and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

## JURISDICTION AND VENUE

14.    This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS

**Plaintiff Obtains Financing for an Automobile Loan from GM Financial in April 2013**

16.     On or about April 27, 2013, Plaintiff purchased a 2006 Mitsubishi Eclipse-4 ("Mitsubishi") from Morrie's Minnetonka Mazda ("Morrie's Mazda") in Minnetonka, Minnesota and entered into a 72-month Retail Installment Contract ("Contract").

17.     Morrie's Mazda immediately assigned Plaintiff's Contract to GM Financial.

18.     After signing the Contract, a Morrie's Mazda representative presented Plaintiff with multiple monthly payment options, including a Smart Payment Plan offered through GM Financial.

19.     The Morrie's Mazda representative informed Plaintiff that if she selected the Smart Payment Plan option, then the amount of her monthly interest payments would significantly decrease towards the end of the loan term and she would end up paying off the loan early, i.e., in less than 72 months.

20.     Plaintiff also agreed to make a one-time down payment in the amount of $2,000.00, which Morrie's Mazda withdrew from her checking account on April 29, 2013.

**Plaintiff Sets Up an Automatic Payment Plan with GM Financial**

21.     GM Financial offered customers, like Plaintiff, the option to set up an automatic payment plan to ensure prompt and convenient payment each month.

22.     Plaintiff, following the advice of the Morrie's Mazda representative, agreed to enroll in the automatic Smart Payment Plan.

23.     The Smart Payment Plan specified that Plaintiff's monthly payments would automatically be taken out of her Wells Fargo checking account biweekly, twice per month, via an Electronic Funds Transfer ("EFT") in the amount of $116.85.

**GM Financial Begins Initiating Electronic Funds Transfer Withdrawals from
Plaintiff's Bank Account in May 2013**

24.     On May 9, 2013, pursuant to the Smart Payment Plan, GM Financial initiated the

first EFT withdrawal from Plaintiff's Wells Fargo checking account in the amount of $116.85.

**GM Financial Initiates Three Monthly Electronic Funds Transfer Withdrawals
From Plaintiff's Bank Account Multiple Times from 2013 to 2018**

25.     Despite the fact that the Smart Payment Plan specified that Plaintiff was to make

only two payments each month, GM Financial initiated three EFT withdrawals from Plaintiff's

Wells Fargo checking account in the amount of $116.85 in the following months and years:

        a.   August 2013;

        b.   July 2014;

        c.   January 2015;

        d.   July 2015;

        e.   December 2015;

        f.   June 2016;

        g.   December 2016;

        h.   June 2017;

        i.   November 2017; and

        j.   May 2018.

26.     As a result of these ten (10) premature EFT withdrawals, Plaintiff was well ahead

of her 72-month payment schedule.

27.     Other than the aforementioned months where GM Financial initiated three EFT

withdrawals, Plaintiff's monthly payments were automatically withdrawn by GM Financial

without issue, twice per month, from May 2013 through October 2018.

**GM Financial Does Not Initiate any EFT Withdrawals in November or December 2018**

28.     GM Financial did not initiate any additional EFT withdrawals from Plaintiff's checking account in November or December 2018.

29.     It was Plaintiff's understanding that her account had been paid in full as of this time period given that she had overpaid numerous months between 2013 and 2018, as indicated above, when GM Financial prematurely initiated three EFT withdrawals instead of the two that were scheduled pursuant to the Smart Payment Plan.

**GM Financial Reports Plaintiff's Account as Delinquent to the National Credit Bureaus, Equifax, Experian, and Trans Union in December 2018**

30.     In or about December 2018, GM Financial inaccurately reported to the national credit bureaus, Equifax, Experian, and Trans Union that Plaintiff's account was 30 days past due as of December 2018.

**GM Financial Initiates Two Additional EFT Withdrawals in January 2019**

31.     On or about January 22, 2019, GM Financial directly initiated two EFT withdrawals from Plaintiff's Wells Fargo checking account in the amounts of $10.00 and $108.00.

32.     Plaintiff was very confused upon noticing these two EFT withdrawals in her Wells Fargo account statement because a) all of her prior payments were initiated by GM Financial through the Smart Payment Plan (not by GM Financial directly); b) the Smart Payment Plan does not mention any partial payments less than the scheduled bi-weekly payments of $116.85; and c) Plaintiff believed that she had paid her account in full.

**Plaintiff Contacts GM Financial in January 2019 to Dispute the Unauthorized EFT Withdrawals**

33.     In or around late January 2019, Plaintiff placed a telephone call to GM Financial and spoke with a representative. Plaintiff questioned the two unauthorized EFT withdrawals

initiated by GM Financial on January 22, 2019. The representative informed Plaintiff that GM Financial initiated the partial payment withdrawals because she was very close to having her account paid in full and the final partial payments would be applied to the remaining principal on her account.

### GM Financial Reports Plaintiff's Account as Delinquent to the National Credit Bureaus, Equifax, Experian, and Trans Union in January 2019

34.     In or about January 2019, GM Financial inaccurately reported to the national credit bureaus, Equifax, Experian, and Trans Union that Plaintiff's account was 60 days past due as of January 2019.

### GM Financial Initiates a Final Unauthorized EFT Withdrawal in February 2019

35.     On February 21, GM Financial initiated a final unauthorized EFT withdrawal from Plaintiff's Wells Fargo checking account in the amount of $109.98.

### GM Financial Reports Plaintiff's Account as Delinquent to the National Credit Bureaus, Equifax, Experian, and Trans Union in February 2019

36.     In or about February 2019, GM Financial inaccurately reported to the national credit bureaus, Equifax, Experian, and Trans Union that Plaintiff's account was 60 days past due as of February 2019.

### Plaintiff Receives Correspondence from GM Financial Confirming her Account was Paid in Full

37.     On February 28, 2019, Plaintiff received written correspondence via mail from GM Financial confirming that, as of February 21, 2019, her account had been paid in full and that it had released its security interest in the 2006 Mitsubishi Eclipse. The letter also provided instructions to have GM Financial's name removed as lienholder and stated that Plaintiff would be entitled to a refund check if it was determined that she paid more than the payoff balance owed on her account.

38.     Upon receiving this correspondence, Plaintiff was ecstatic because she now owned her Mitsubishi Eclipse outright and had drastically improved her credit rating by successfully making all timely monthly payments to GM Financial as required pursuant to the Contract and Smart Payment Plan.

39.     From May 2013 through February 2019, Plaintiff never once was delinquent or missed a scheduled payment to GM Financial.

**Plaintiff Attempts to Obtain Financing for the Purchase of a Used Vehicle in July 2019**

40.     On or about July 15, 2019, Plaintiff sought to obtain financing for the purchase of a vehicle at Morrie's Minnetonka Ford in Minnetonka, Minnesota.

41.     Plaintiff worked with a used car salesman and found a used 2012 Lexus RX 350 ("2012 Lexus") with approximately 100,000 miles that she was interested in purchasing for approximately $10,000.00.

42.     Thereafter, Plaintiff worked with a Sales Representative, Casey, and a Finance Manager to submit a credit application and discuss financing options for the 2012 Lexus. Plaintiff requested that the Finance Manager seek financing options through GM Financial, as it had financed her previous vehicle. The Finance Manager explained that Morrie's Minnetonka Ford typically runs consumers' credit applications through several lenders in an attempt to obtain the most competitive financing rate.

43.     On or about July 15, 2019, based on the contents of her Trans Union credit report, which included the multiple inaccurate late payments reported by GM Financial, Royal Credit Union approved Plaintiff for financing at a 30% annual percentage rate ("APR") and Capital One Auto Finance denied Plaintiff credit.

44.     On or about July 15, 2019, based on the contents of her Experian credit report,
which included the multiple inaccurate late payments reported by GM Financial, Morrie's
Minnetonka Ford, Capital One Auto Finance, Consumer Portfolio Services, and Credit Acceptance
Corporation all denied Plaintiff credit.

45.     On or about July 15, 2019, based on the contents of her Equifax credit report, which
included the multiple inaccurate late payments reported by GM Financial, Wells Fargo Dealer
Services, Ally Financial, Morrie's Minnetonka Ford, Capital One Auto Finance, Consumer
Portfolio Services, and Americredit Financial Services all denied Plaintiff credit.

46.     Plaintiff then asked the Finance Manager if he could just obtain her financing
through GM Financial, reminding him that GM Financial had financed her previous vehicle
purchase and she had submitted timely monthly payments throughout the life of the loan.

47.     The Finance Manager then informed Plaintiff that the only way he would be able
to help her obtain financing for the 2012 Lexus was if she had a co-signer.

48.     Shortly thereafter, Plaintiff called her parents, explained the situation, and they
arrived at Morrie's Minnetonka Ford and signed all requisite paperwork agreeing to be co-signers
on Plaintiff's credit application.

49.     After spending six hours at Morrie's Minnetonka Ford working with the Finance
Manager, the Finance Manager informed Plaintiff that based on her recent delinquent auto loan
payments as reported by GM Financial and Trans Union, Equifax, and Experian, and the effect
such delinquencies had on her credit scores, she did not qualify for financing, even with her parents
acting as co-signers.

50.     Plaintiff was embarrassed and humiliated by the inaccurate and defamatory credit information reported by GM Financial and Trans Union, Equifax, and Experian (the "credit bureaus"), and was in tears when she left the dealership with her parents.

51.     On or about July 19, 2019, based on the contents of her Equifax credit report, which included the multiple inaccurate late payments reported by GM Financial, Sharepoint Credit Union also denied Plaintiff credit.

**Plaintiff Attempts to Obtain Financing for the Purchase of a Used Vehicle in August 2019**

52.     On or about August 12, 2019, in desperate need of a vehicle to get to work and hoping her credit reports had been corrected, Plaintiff returned to Morrie's Minnetonka Ford to once again try to obtain financing for the purchase of a vehicle.

53.     Plaintiff worked with a used car salesman and found a used Nissan Pathfinder with approximately 70,000 miles that she was interested in purchasing for approximately $15,000.00.

54.     Plaintiff once again worked with the Sales Representative, Casey, and the same Finance Manager to submit a credit application and discuss financing options for the Nissan Pathfinder.

55.     The Finance Manager informed Plaintiff that her credit reports and scores had not changed since July 2019 and, consequently, she would need a co-signer. The Finance Manager also told Plaintiff that because GM Financial was reporting 30, 60, and 90 day-late payments within the past 12 months, Morrie's Minnetonka Ford could not approve her for financing unless she was willing to accept an APR in the range of 30%.

56.     After Plaintiff's parents arrived at the dealership and agreed to serve as co-signers, the Finance Manager submitted the new credit application. Upon reviewing the results in his system, the Finance Manager informed Plaintiff that the only way he could sell her the Nissan

Pathfinder was if her parents agreed to submit a joint credit application that did not include Plaintiff.

57.     Plaintiff, now distraught, rejected the Finance Manager's proposal and left the dealership.

58.     On or about August 12, 2019, based on the contents of her Trans Union credit report, which included the multiple inaccurate late payments reported by GM Financial, Flagship Credit Acceptance and Auto Center Bargain Lot denied Plaintiff credit.

59.     On or about August 12, 2019, based on the contents of her Experian credit report, which included the multiple inaccurate late payments reported by GM Financial, Wings Financial Credit Union denied Plaintiff credit.

60.     On or about August 12, 2019, based on the contents of her Equifax credit report, which included the multiple inaccurate late payments reported by GM Financial, Wells Fargo Dealer Services, Ally Financial, Spire Credit Union, Ideal Credit Union, and Fifth Third Bank all denied Plaintiff credit.

**Plaintiff's First Dispute with GM Financial in August 2019**

61.     On or about August 15, 2019, Plaintiff placed a telephone call to GM Financial and spoke with a representative named Taylor. Plaintiff explained her situation in detail and specifically stated that she was calling to dispute inaccurate information that GM Financial had reported to the credit bureaus. Plaintiff insisted that she had never missed a payment and even received correspondence from GM Financial in February 2019 confirming her account had been timely paid in full.

62.     Taylor pulled up Plaintiff's account information and reviewed her payment history and balance. Thereafter, Taylor apologized to Plaintiff, admitting that GM Financial had made a

mistake regarding the late payments it reported to the credit bureaus. Taylor confirmed that Plaintiff had in fact submitted timely payments to GM Financial, pursuant to her payment plan, throughout the life of the loan.

63.     Plaintiff requested that GM Financial correct its inaccurate reporting immediately because the false information was damaging her credit scores and preventing her from obtaining financing for a vehicle.

64.     Taylor assured Plaintiff that he would send a form to GM Financial's Credit Department requesting that it communicate with the credit bureaus to correct the inaccurate reporting and remove all late or delinquent payments reporting on her account.

65.     Taylor assured Plaintiff the misreporting would be rectified within 30 days and that she would receive mail correspondence from GM Financial confirming that the credit reporting issues had been corrected within two weeks.

**Plaintiff Receives Mail Correspondence from GM Financial in August 2019**

66.     In or about mid-August 2019, Plaintiff received mail correspondence from GM Financial. The envelope contained a blank piece of stationary including only GM Financial's letterhead and Plaintiff's mailing address. No other information was included on the document.

**Plaintiff's Second Dispute with GM Financial in Late August 2019**

67.     In about late August 2019, Plaintiff placed a second telephone call to GM Financial and spoke with a representative. Plaintiff once again explained her situation in detail and specifically stated that she was calling to dispute inaccurate information that GM Financial had reported to the credit bureaus. Plaintiff insisted that she had never missed a payment and even received correspondence from GM Financial in February 2019 confirming her account had been timely paid in full. Plaintiff also mentioned that she had recently received mail correspondence

from GM Financial containing nothing but a blank letterhead and that she was calling to confirm that her previous dispute had actually been sent to the Credit Department.

68.     The representative pulled up Plaintiff's account information in the system and reviewed her payment history and balance. Thereafter, the representative confirmed that his records indicated that a) GM Financial overcharged her in August 2018, and b) Plaintiff's previous dispute had yet to be sent to the Credit Department. Before ending the call, the representative assured Plaintiff that she would receive a letter from GM Financial once the issue was corrected and that it would take up to 30 days to correct with the issue with the credit bureaus.

**Plaintiff Attempts to Obtain Financing for the Purchase of a Used Vehicle in Late August 2019**

69.     In or about August 2019, still in desperate need of a vehicle to get to work and hoping her credit reports had been corrected, Plaintiff went to the Auto Center Bargain Lot ("ACBL") to once again try to obtain financing for the purchase of a vehicle.

70.     Plaintiff worked with a used car salesman and found a used 2016 Lexus RX 350 ("2016 Lexus") that she was interested in purchasing.

71.     Plaintiff worked with a Sales Representative and Finance Manager to submit a credit application and discuss financing options for the 2016 Lexus.

72.     The Finance Manager informed Plaintiff that her credit reports and scores had not changed since July 2019 and, consequently, she would need a co-signer. The Finance Manager also told Plaintiff that because GM Financial was reporting 30, 60, and 90 day-late payments within the past 12 months, ACBL could only approve her for financing if she had a co-signer and was willing to agree to an APR of 25%.

73.     Plaintiff rejected the Finance Manager's proposal and decided to continue disputing with GM Financial.

**Plaintiff's Third Dispute with GM Financial in September 2019**

74.     In about early September 2019, Plaintiff placed a third telephone call to GM Financial and spoke with a representative. Plaintiff once again explained her situation in detail and specifically stated that she was calling to dispute inaccurate information that GM Financial had reported to the credit bureaus. Plaintiff stated she was calling to confirm that her previous two disputes had actually been sent to the Credit Department and asked to speak with the Supervisor of GM Financial's Credit Department.

75.     The representative told Plaintiff the Supervisor was not available. Plaintiff asked for the Supervisor's name and direct dial so that she could call back. The representative told Plaintiff that company policy did not allow him to provide the requested information. Plaintiff then requested that the representative take down her name and number and have a Supervisor return her phone call. The representative ended the call.

**Plaintiff's March 2020 Disputes with the Credit Reporting Agencies**

76.     On March 2, 2020, Plaintiff mailed written disputes via certified mail to Equifax, Experian, and Trans Union's consumer dispute departments, disputing the inaccurate reporting of the GM Financial tradeline, Account #45087****. Specifically, Plaintiff's dispute stated, among other things, as follows:

> I am disputing the accuracy of this tradeline on my credit report. My GM Financial Account Number 45087**** is currently reporting late payments as follows:
>
> December 2018: 30 Days Past Due
> January 2019: 60 Days Past Due
> February 2019: 60 Days Past Due
>
> This reporting is inaccurate. I made timely payments in December 2018, January 2019, and February 2019, and have attached my proof of payment to this letter. I have never made a late payment to GM Financial. Thus, I am requesting that the late payments (listed above) be deleted immediately as

they are negatively affecting my credit score and causing me to be denied credit. Please reinvestigate this matter and delete the disputed payments within 30 days. Enclosed is a copy of my [insert credit bureau name] credit report where I have highlighted the inaccurate late payments that I am requesting be deleted.

77.    Plaintiff attached a copy of her Equifax, Experian, and Trans Union credit reports, highlighting the inaccurate auto loan tradeline reported on each, and also attached a copy of the proof of payment correspondence she received from GM Financial in February 2019.

**The Consumer Reporting Agencies' Method for Considering Consumer Credit Report Disputes**

78.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. *See* 15 U.S.C. § 1681i(a)(5)(D).

79.    Consumer reporting agencies Equifax, Experian, Trans Union, and Innovis have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows data furnishers to create and respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

80.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro II."  It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

81.    Metro II is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

82.     Metro II codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification (ACDV) electronic form.

83.     The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

84.     These ACDV "fields" have various titles for the many substantive areas into which the Metro II codes can be entered.

**The Credit Reporting Agencies' Responses to Plaintiff's March 2020 Disputes**

85.     Trans Union sent an ACDV to GM Financial regarding the disputed auto loan tradeline, Account #45087****.

86.     GM Financial Corporation verified for Trans Union that Account #45087**** was accurately reporting on Plaintiff's credit report.

87.     On March 13, 2020, Trans Union completed its reinvestigation of Plaintiff's dispute, which consisted of nothing more than parroting GM Financial's verification of the late payments and returned the results of its 15 U.S.C. § 1681i dispute reinvestigation. Trans Union stated "DISPUTED INFORMATION UPDATED. A change was made to the item(s) based on your dispute and other information has also changed." Trans Union failed to remove the disputed late payments, which continue to appear on Plaintiff's Trans Union credit report.

88.     Equifax sent an ACDV to GM Financial regarding the disputed auto loan tradeline, Account #45087****.

89.     GM Financial Corporation verified for Equifax that Account #45087**** was accurately reporting on Plaintiff's credit report.

90.     On March 13, 2020, Equifax completed its reinvestigation of Plaintiff's dispute which consisted of nothing more than parroting GM Financial's verification of the late payments

and returned the results of its 15 U.S.C. § 1681i dispute reinvestigation. Equifax stated, "This account has been updated. Historical account information was updated on this account. THE FOLLOWING FIELDS HAVE BEEN MODIFIED. * ADDITIONAL INFORMATION, *ACCOUNT HISTORY, and *HISTORICAL ACCOUNT INFORMATION. If you have additional questions about this item please contact GM Financial." Equifax failed to remove the disputed late payments, which continue to appear on Plaintiff's Equifax credit report.

91.     Experian sent an ACDV to GM Financial regarding Plaintiff's disputed auto loan tradeline, Account #45087****.

92.     GM Financial verified for Experian that Account #45087**** was accurately reporting on Plaintiff's credit report.

93.     On March 25, 2020, Experian completed its reinvestigation of Plaintiff's dispute which consisted of nothing more than parroting GM Financial's verification of the late payments and returned the results of its 15 U.S.C. § 1681i dispute reinvestigation. Experian stated, "Outcome: Updated – The item you disputed has been updated, which may include an update to the disputed information. Please review your report for the details." Experian failed to remove the disputed late payments, which continue to appear on Plaintiff's Experian credit report.

94.     GM Financial violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to communicate to the credit bureaus to remove the inaccurate late payments.

95.     As a standard practice, Equifax, Experian, and Trans Union do not conduct independent investigations in response to consumer disputes. Instead, they merely parrot the response of the furnisher despite numerous court decisions admonishing this practice. *See*

*Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) ("The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources. Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230–31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

96.     Consistent with their standard policies and procedures, Equifax, Experian, and Trans Union automatically generated their "investigation" results once the furnisher, GM Financial, provided its response to Plaintiff's disputes, verifying the disputed late payments as accurate, and no employee from any of the credit reporting agencies took any additional steps to review Plaintiff's documentation after the furnisher provided its responses to Plaintiff's disputes.

97.     Instead, Equifax, Experian, and Trans Union blindly accepted GM Financial's incomplete version of the facts and continued to report the inaccurate, derogatory information on Plaintiff's credit reports.

98.     Equifax, Experian, and Trans Union continue the practice of parroting the response from furnishers even though they have been repeatedly sued for failing to conduct reasonable investigations as required by the FCRA.

99.     Equifax, Experian, and Trans Union do not intend to modify their dispute-processing procedures because doing so would drastically increase their operating expenses.

100.    Instead, Equifax, Experian, and Trans Union intentionally choose not to comply with the FCRA to lower their costs. Accordingly, Defendants' violations of the FCRA are willful.

101.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

### CLAIMS FOR RELIEF

### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedure to Assure Maximum Possible Accuracy
### (First Claim For Relief Against Defendants Equifax, Experian, and Trans Union)

102.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-101 as if fully stated herein.

103.    Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files they published and maintain concerning Plaintiff.

104.    As a result of Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

105.    Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

106.     Plaintiff is entitled to recover attorney's fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**Failure to Perform Reasonable Reinvestigation**
**(Second Claim For Relief Against Defendants Equifax, Experian, and Trans Union)**

107.     Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-101 as if fully stated herein.

108.     Defendants Equifax, Experian, and Trans Union violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiff's credit file after it received notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant information to GM Financial; by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file; and by relying upon verification from a source it has reason to know is unreliable.

109.     As a result of Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

110.     Defendants Equifax, Experian, and Trans Union's conduct, action, and inaction was willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

111.    Plaintiff is entitled to recover attorney's fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT III
### 15 U.S.C. § 1681s-2(b)
**Failure to Conduct an Investigation of the Disputed Information and Review all Relevant Information Provided by the Consumer**
**(First Claim For Relief Against Defendant GM Financial)**

112.    Plaintiff re-alleges and incorporates the allegations set forth in Paragraphs 1-101 as if fully stated herein.

113.    Defendant GM Financial published the negative entries to Defendants Equifax, Experian, and Trans Union.

114.    Defendant GM Financial violated 15 U.S.C. § 1681s-2(b) by failing to fully and properly investigate Plaintiff's disputes of its inaccurate representations; by failing to review all relevant information regarding the same; by failing to accurately respond to Defendants Equifax, Experian, and Trans Union; by failing to correctly report results of an accurate investigation to Defendants Equifax, Experian, and Trans Union; and by failing to permanently and lawfully correct its own internals records to prevent the re-reporting of its inaccurate representations to Defendants Equifax, Experian, and Trans Union.

115.    As a result of Defendant GM Financial's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of the ability to purchase and benefit from her good name and credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

116.    Defendant GM Financial's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

117.    Plaintiff is entitled to recover attorney's fees and costs from Defendant GM Financial in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

a)    Determining that Defendants, jointly and severally, negligently and/or willfully violated the FCRA;

b)    Awarding actual damages, statutory, and punitive damages as provided by the FCRA;

c)    Awarding reasonable attorneys' fees and costs as provided by the FCRA; and

d)    Granting further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

118.    Plaintiff demands a trial by jury.


Dated: January 11, 2021.

**BERGER MONTAGUE PC**

*/s/ Hans W. Lodge*
Hans W. Lodge, MN Bar No. 0397012
43 SE Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 607-7794
Fax: (612) 584-4470
Email: hlodge@bm.net

*ATTORNEYS FOR PLAINTIFF*